*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF JOSEPH VERGA.

LAWRENCE D. VERGA, JR., Personal
Representative of the ESTATE OF JOSEPH
VERGA,

        Appellee,

v

JAMES WASWICK,

        Appellant,

and

NANCY GOOD, DOROTHY CLYMER, and
MARY MEDICH,

        Appellees.

UNPUBLISHED
March 25, 2021

No. 351145
Huron Probate Court
LC No. 13-039469-DA

Before: LETICA, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

Appellant, James Waswick, proceeding *in propria persona*, appeals as of right the probate court's order upholding a 2012 will and power of attorney (POA) and a 2013 deed executed by the deceased, Joseph Verga (JV), Waswick's uncle. The court also ruled that appellee Lawrence D. Verga, Jr. (LVJ), the personal representative of JV's estate, did not abuse the POA JV granted to

-1-

him.[1]  And, although the court ordered some corrections to the final estate accounting, it did not accept all of the arguments presented for correction.  We affirm.

## I.  BACKGROUND

In 2006, JV executed a will and POA, ostensibly making LVJ—Waswick's cousin and one of JV's nephews—his personal representative and granting LVJ his POA.  The will left any remainder of JV's estate to all his nieces and nephews in equal shares.  The name listed on the 2006 documents was "Lawrence R. Verga II," but LVJ's legal name is "Lawrence D. Verga, Jr." On February 16, 2012, a new will and POA were executed, with the only material change being the listing of LVJ's full and correct legal name.  Subsequently, on March 14, 2013, JV signed a ladybird deed granting his home, upon his death, to LVJ.

JV died in June 2013.  Waswick, along with some of the other heirs, sought to remove LVJ as the personal representative of JV's estate, but the probate court denied their request.  In a prior appeal, we affirmed the probate court's decision.  *In re Estate of Verga*, unpublished per curiam opinion of the Court of Appeals, issued October 11, 2018 (Docket Nos. 340980 and 341346).

Subsequently, a bench trial took place during which Waswick and other heirs argued that JV was mentally incompetent, in part, due to Parkinson's disease, at the time of signing the 2012 will and POA and the 2013 deed.  They also argued that LVJ abused the POA by diverting funds and making various errors in settling JV's estate.  The court rejected most of the heirs' arguments, but ordered some adjustments to the estate's accounting.

This appeal followed.

## II.  DISCUSSION

Waswick contends that the probate court made several errors in its rulings.[2]  We disagree.

---

[1] Waswick, Nancy Good, Dorothy Clymer, and Mary Medich all challenged the will, power of attorney, and deed at issue below.  However, only Waswick appealed the probate court's order. Good, Clymer, and Medich concur in Waswick's arguments, as interested parties.

[2] Because Waswick represents himself, we have a duty to liberally construe his arguments in the interest of justice.  See *Estelle v Gamble*, 429 US 97, 106; 97 S Ct 285; 50 L Ed 2d 251 (1976). Accordingly, we have reordered the fourteen separate issues he raises into appropriate categories. Frankly, our review of some of Waswick's claims has been complicated by his failure to cite to the record, including to purported quotations from the transcripts.  See e.g., MCR 7.212(C)(7) ("Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court.  Page references to the transcript, the pleadings, or other document or paper filed with the trial court must also be given to show whether the issue was preserved for appeal by appropriate objection or by other means.").  Moreover, as the appellant in an appeal arising from a probate court estate proceeding, Waswick was responsible for securing the filing of "that portion of the transcript concerning the order appealed from . . . ."

We review for clear error the findings of fact made by a probate court sitting without a jury. *In re Estate of Erickson*, 202 Mich App 329, 331; 508 NW2d 181 (1993). "The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *Id.*

## A. COMPETENCY AND RELATED ISSUES

Waswick argues that the probate court should have ruled that JV was incompetent when signing the 2012 will and POA and the 2013 deed. We disagree.

MCL 700.2501(2) provides:

> An individual has sufficient mental capacity to make a will if all of the following requirements are met:
>
> (a) The individual has the ability to understand that he or she is providing for the disposition of his or her property after death.
>
> (b) The individual has the ability to know the nature and extent of his or her property.
>
> (c) The individual knows the natural objects of his or her bounty.
>
> (d) The individual has the ability to understand in a reasonable manner the general nature and effect of his or her act in signing the will.

The test for assessing an individual's competency as to a conveyance of property is "whether at the time he executed the deeds in question he had sufficient mental capacity to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep these facts in his mind long enough to plan and effect the conveyances in question without prompting and interference from others." *Wroblewski v Wroblewski*, 329 Mich 61, 66; 44 NW2d 869 (1950) (quotation marks omitted). And the test for whether an individual was competent to execute a POA is whether the person was "incapable of understanding the nature and consequences of h[is] actions." *Persinger v Holst*, 248 Mich App 499, 509; 639 NW2d 594 (2001).

In this case, on February 12, 2012, Dr. Bhikam Mehta signed a document for JV's assisted-living facility stating that JV was not able to make financial decisions, and on February 17, 2012, Dr. Ali Khan signed this same document. At first blush, this seems nearly dispositive regarding competency for the February 16, 2012 will and POA signings. However, as an initial matter, we note that, although Dr. Khan had contact with JV, he never treated him; instead, Dr. Khan helped

---

MCR 7.210(B)(1)(b). To the extent that Waswick has failed to provide a necessary transcript for our review, we must decline to consider the underlying issue presented. See *PT Today, Inc v Comm'r of Office of Fin & Ins Servs*, 270 Mich App 110, 151-152; 715 NW2d 398 (2006).

-3-

Dr. Mehta by reviewing Dr. Mehta's reports. Dr. Mehta, the treating physician, testified that advanced Parkinson's disease was progressive and often causes cognitive impairment, but that impairment can be intermittent throughout the day. The incompetency document itself referred to "intermittent confusion." Dr. Mehta explicitly testified, "Even in a given day, you may be very lucid in the morning." Dr. Mehta further opined that JV's incompetence at the time was related, in part, to pneumonia, dehydration, and other conditions. With treatment, JV's pneumonia improved. In addition, Gerald Prill, the then-attorney, now-judge, who assisted with the signings, testified that before the signings he talked with JV to see if he understood what was happening:

> The process was to sit down with him, talk with him just to see overall how he was acting, whether he understood. And I hate to use this phrase, but I've used it many a time, if he knows the difference between Christmas and Tuesday. In other words, does he understand what's going on, does he understand why I'm there, engage in conversation even involving, for instance, who the president is, why he's there, who his family members are. Just, just to kind of get a feel as to, in my opinion, his competency at the time.

Prill stated that he had no information and observed no signs indicating that JV was not competent.

We are mindful of our standard of review. As our Supreme Court explained in *In re Estate of Erickson*, 202 Mich App at 331:

> Findings of fact made by a probate court sitting without a jury will not be reversed unless clearly erroneous. A finding is said to be clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court. [(citations omitted).]

Given Dr. Mehta's acknowledgement of the intermittent nature of the confusion Parkinson's disease caused and Prill's testimony, we cannot conclude that the probate court clearly erred by finding that JV was competent to sign the 2012 will and POA. Indeed, the probate court greatly emphasized the intermittent nature of JV's confusion and concluded that Prill was in the best position to assess JV's legal competence at the time of signing.

Moreover, it is undisputed that the 2012 will and POA were materially the same as the 2006 will and POA, aside from the correction of LVJ's legal name. Additionally, no one disputed

the testimony by Stephen Carras,[3] that "Lawrence R. Verga II" in the 2006 documents was a mistaken reference to LVJ's legal name of Lawrence D. Verga, Jr.[4]

Waswick, however, alleges that LVJ's attorney improperly testified for LVJ by stating, "Those [i.e., the two names] are the same and are my client." We reject this contention. First, contrary to the requirements of MCR 7.212(C)(7), Waswick does not indicate where in the record this statement occurred. Second, Waswick fails to provide any legal authority for his assertion that this alleged statement from LVJ's attorney was improper. See *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) ("[A] mere statement without authority is insufficient to bring an issue before this Court."). Third, we presume that the trial court, sitting as trier of fact in this case, "knew the law and considered only the evidence properly before it . . . ." *In re Archer*, 277 Mich App 71, 84; 744 NW2d 1 (2007). And "it is well settled that an attorney's statements . . . are not evidence." *In re Conservatorship of Brody*, 321 Mich App 332, 349; 909 NW2d 849 (2017). Fourth, even if LVJ's trial attorney made this statement and even if it was improper for him to do so, Carras provided the same testimony, rendering any error harmless.[5]

Waswick also contends that he was improperly prohibited from asking "rebuttal" questions of Dr. Mehta after LVJ's attorney questioned the doctor. The record refutes his contention. The court allowed Waswick to question Dr. Mehta in response to testimony elicited by LVJ's attorney, and, after Waswick questioned the doctor, the court even prompted Waswick further by asking, "Any further questions, Mr. Waswick?" Waswick answered, "No . . . . I don't have anything."

Turning to the March 14, 2013 deed, Tom Plamondon, a physician's assistant, testified that, on March 5, 2013, he gave JV a "mini-mental state examination." Plamondon concluded that JV scored 15 out of 30 on the test, which correlated with "severe cognitive impairment."[6]

---

[3] Attorney Carras prepared the 2006 documents, and, later, became a judge.

[4] Waswick takes issue with this testimony on appeal, but it was unobjected to below. And no one provided evidence that "Lawrence R. Verga II" was someone other than LVJ. We also note that the validity of the 2006 documents was not raised as an issue in the third amended petition, in which the heirs attempted to invalidate the 2012 documents.

[5] Waswick states that LVJ's trial attorney was allowed to testify "multiple times for his client." Yet, Waswick fails to identify what this alleged repeated testimony was. While he cites to Dr. Mehta's November 2, 2018 testimony, LVJ's attorney was not testifying; instead, he was making an argument and citing Carras's testimony.

[6] Waswick mentions in passing that the court clearly erred in ruling. in part, that Plamondon was not qualified to offer an expert opinion. Waswick does not separately raise this argument, MCR 7.212(C)(5), or identify where the court's ruling was made, MCR 7.212(C)(7). Reviewing Plamondon's trial testimony, the court recognized the distinction between lay and expert testimony. MRE 701 and 702. The court was cognizant that Plamondon provided services to JV and it also ruled Plamondon qualified as an expert. The court considered Plamondon's expert opinion limited to his area of expertise. This was not error. *Mulholland v DEC Intern Corp*, 432 Mich 395, 406; 443 NW2d 340 (1989) ("[T]he only safe rule is to ascertain with some specificity the range of the witness' qualifications and to permit testimony within that range."). But, even if

Plamondon, however, acknowledged that he had "no information about [JV's] status on" the date of the deed signing. Additionally, Dr. Mehta was extremely adamant in emphasizing that he did not know any specifics regarding JV's condition between February 2012 and May 2013, when he began treating JV again.

Dr. Robert Chadwick testified that, based on JV's score of 15, he "would say [JV]" was "not qualified" to make financial and legal decisions. But Michael Valentine, the director of one of JV's assisted-living facilities, testified that assessments were performed in February 2012 and a year later to determine the level of care JV required. According to the February 14, 2013 assessment, JV was "alert and oriented, able to focus, and shift attention[; in addition to], comprehend[ing][and] recall[ing] tasks directly—or directions independently." The assessment was based on information gleaned throughout the year at the facility. Valentine testified that he saw JV on a daily basis and that JV's cognitive ability was consistently fine. For these reasons, JV was under the least amount of supervision at the facility.

Prill testified that JV wanted "Robby" to have his house and that "Robby" was LVJ. Prill maintained that JV was "really adamant" about LVJ getting the house, and testified that there was "no question in [his] mind" at the time the deed was signed that JV understood what he was signing.

Given all of this evidence, the probate court did not clearly err by finding that JV was competent at the time of the deed signing. Waswick, however, asserts that the probate court did not give enough weight to the lay testimony of one of JV's nieces. But her testimony was that she saw JV at a funeral on September 12, 2012, and, at the time, he looked at her with a "blank stare" as though he did not recognize her. Given our standard of review, we cannot conclude that the probate court clearly erred in crediting Prill's testimony regarding his interactions with JV over his niece's testimony.

---

the court had erred, any error was harmless as Dr. Robert Chadwick provided the expert testimony Waswick and the heirs sought from Plamondon. MCR 2.613(A) ("An error in the . . . exclusion of evidence . . . is not [a] ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.").

Waswick further argues that the probate court erred by initially declining to admit Plamondon's report under MRE 803(6).[7]  But, after the other heirs' attorney laid the proper foundation, the probate court admitted the exhibit into evidence.  Thus, Waswick's argument fails.[8]

Waswick contends that the court should have considered a handwritten directive that Carras mentioned during his testimony.  Carras testified that the directive was "shared with [his] office early in 2006."  During trial, the court did not allow the directive into evidence because it determined that the directive was irrelevant.[9]  Waswick argues that the directive, which he refers to as a "holographic will," demonstrates that JV's house belonged in the estate.  We disagree.  Although the directive is undated and appears to contain JV's signature, it states that the house should be sold upon JV's death, with proceeds going to persons "I have named on the certificate."  This reference to "the certificate" may be to the certificates of deposit (CDs) mentioned earlier in the directive.  In any event, given that the probate court did not clearly err by finding the deed valid, and given that the deed clearly postdates the handwritten directive, the directive is irrelevant and we discern no error.[10]

---

[7] MRE 803(6) reads:

> A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

[8] Waswick attempts to make an additional MRE 803(6) argument.  From what we can glean, this argument relates to Dr. Khan's assessment of competency and an attempt to introduce additional medical records regarding a competency test.  The probate court declined to admit the record because Dr. Khan had not prepared it and no recordkeeper or other qualified witness from the medical facility testified.  Accordingly, the probate court did not abuse its discretion.  See *People v Fackelman*, 489 Mich 515, 536-537; 802 NW2d 552 (2011).  In any event, Waswick cannot demonstrate that any error was outcome determinative.  Dr. Khan's oral testimony adequately reflected his opinion regarding JV's incompetency.  And Dr. Mehta, who prepared the record, discussed it and it was admitted during his testimony.

[9] In his reply brief, Waswick recognizes that the directive was marked as an exhibit to Prill's *de bene esse* deposition, which was admitted during trial.

[10] The 2006 and 2012 wills do not explicitly mention the house, but state that JV "may from time to time indicate my desire that specific gifts be made from my estate upon my death" and that the

## B. UNDUE INFLUENCE

Waswick argues that there was a presumption of undue influence with regard to LVJ's sending his attorney, Prill, to have JV sign the 2012 POA and the 2013 deed, and that the court should have made a finding of undue influence.[11] Waswick also argues that the court erred by referring to Prill as JV's attorney when Prill was, in fact, LVJ's attorney.

As stated in *In re Estate of Erickson*:

> To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, is not sufficient. [202 Mich App at 331.]

In addition:

> A presumption of undue influence arises upon the introduction of evidence that would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary, or an interest represented by the fiduciary, benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction. [*Id*.]

Addressing the deed transaction first, LVJ had a fiduciary relationship with JV, LVJ benefited from the deed, and LVJ had an opportunity to influence JV's decision about the deed through LVJ's contact with JV. Therefore, a presumption of undue influence existed with regard to the deed.

Once a presumption of undue influence arises, the burden of going forward with contrary evidence falls on the party arguing against undue influence. *In re Estate of Peterson*, 193 Mich App 257, 261; 483 NW2d 624 (1991). And "[w]hether the presumption of undue influence is rebutted is a question to be resolved by the finder of fact." *Id*.

In this case, the probate court did not clearly err by finding that any presumption of undue influence had been rebutted. Prill testified that, during the two 2012 visits about the will and POA, JV had asked what was going to happen to his house. Prill explained to JV that, according to the will, the house would be sold and the proceeds divided among the nieces and nephews. According to Prill, JV repeated "over and over again" that he did not want the house to be sold and stated that he wanted to give the house to LVJ, who had been assisting in JV's care. Prill testified that he was only doing what JV had asked him to do regarding the deed. At Prill's deposition, which was

---

"rest, residue and remainder of my estate and property" will go to "my nieces and nephews, in equal shares."

[11] The third amended petition alleged undue influence with regard to the POA and deed, not the will. LVJ was not given anything more in the will than any other niece or nephew.

admitted into evidence, Prill explained that JV was "really adamant" about LVJ getting the house. LVJ was not present at the signing of the deed. Prill testified that JV told Prill that the signing of the deed was "what he wanted done." Given the evidence that it was JV who asked about the disposition of the house and freely told Prill that he wanted LVJ to have it, the probate court's conclusion that any presumption of undue influence had been rebutted was not clearly erroneous.

Waswick, however, takes issue with the probate court's reference to Prill as JV's attorney. Waswick contends that the court's "decision was clearly erroneous" because it stated that "Gerald Prill was Joseph Verga's, the deceased's[,] attorney." Review of the transcript does not include this finding. Rather, as to the ladybird deed, the court determined that JV initiated its creation and "had the independent advice of counsel [Prill]" and "met freely with counsel without" LVJ being present. Waswick maintains that Prill was LVJ's attorney, not JV's. Waswick refers to an appearance letter, earlier in the case—before LVJ obtained different counsel—in which Prill asserted that he was only representing LVJ. But this appearance was in December 2013, after JV's death; it stands to reason that Prill was not going to file an appearance for JV at that point in time. And, during trial, Prill repeatedly testified that he was serving both JV and LVJ in general. As the probate court determined, Prill testified that LVJ did not tell him that he wanted to be on the deed; instead, it was JV who directed Prill's actions regarding the deed. Consequently, the court's comments were proper and provide no basis for reversal of its ultimate conclusion regarding undue influence.

Addressing the 2012 POA, we conclude that Waswick did not provide adequate evidence that LVJ benefited from being made JV's POA, and thus, there was no presumption of undue influence. Although Waswick and Medich testified that JV separately told them that LVJ stole money from JV,[12] the court rejected these assertions when it concluded that LVJ acted properly under the POA. The probate court was the arbitrator of credibility here. Moreover, given the substantial evidence that LVJ believed that he had already been granted JV's POA in 2006 and was simply attempting to clarify the legal spelling of his name, there is no basis for a finding of undue influence. Even in the handwritten directive that Waswick promotes, JV refers to his desire for "Robbi" to have his POA. And, at the trial in February 2019, Waswick, representing himself and questioning one of JV's nieces, referred to LVJ as "Robbie." Prill, in his deposition testimony, stated that "Robby" was LVJ. Under all the circumstances, there is no basis for a finding of undue influence regarding the POA.

## C. CERTIFICATES OF DEPOSIT, CHECKS, AND HOME CONTENTS

Waswick asserts that the probate court erred by finding that nothing untoward occurred when LVJ cashed certain CDs. He also asserts that the court failed to make any rulings about various checks that LVJ cashed when acting under JV's POA and failed to answer the heirs' request for the "real value of the deceased's home contents."

---

[12] Waswick suggests that the trial court erred by sustaining a hearsay objection to this testimony. The record does not reflect an objection to this testimony during the October 2017 hearing on this basis.

LVJ testified that he cashed one of JV's CDs, referred to as "41466," toward the beginning of 2013 to pay for JV's care. Waswick's mother, Augustine Waswick (AW), was named on the CD, and she died in September 2012. Waswick notes that this CD was not joint with rights of survivorship; however, AW was designated along with "Larry Verga," as a beneficiary of the CD. The court did not clearly err by finding that there was no wrongdoing in connection with this CD because LVJ appropriately used the POA to cash it along with another CD used for JV's care. Indeed, the court determined that a substantial amount of the monies were directly deposited to the care facility and that the remainder was deposited into the estate account.

As for another CD with AW's name on it that Waswick mentions on appeal, this CD was not considered during trial. For this reason, we conclude that this issue was waived.[13] *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Another CD showed the name of Delores Gricar; LVJ indicated that it was cashed out and placed in JV's checking account in May 2013 with the intention to use it to pay for JV's care and outstanding bills. LVJ testified that he cashed the Gricar CD because the funds in JV's checking account, used for his care, had been running low. JV then died at the end of June 2013. Thereafter, in August 2013, a check for the money remaining in JV's checking account was made out to LVJ because he was listed as the beneficiary on the account. Initially, it would appear that any of this remaining money, including any money left over from the Gricar CD, needed to be distributed among JV's heirs. We note, however, that the court explicitly took judicial notice of the proceedings on October 6, 2017, which occurred before the first appeal. At that hearing, LVJ explained that he distributed money from his own checking account to JV's relatives. He stated that because he was listed as the beneficiary on JV's checking account, he ended up with some of JV's money in his own account and decided to distribute it to four people. He issued four $5,000 checks, one of which was issued to Waswick. Waswick is the sole appellant in the present appeal. Accordingly, he has already received a remedy with regard to any error that occurred in connection with the Gricar CD.

As for the checks that Waswick challenges, LVJ testified that he withdrew money from JV's checking account for things that were needed for JV's care. For example, one withdrawal was for a dental visit and another was for household expenses. LVJ indicated that he was not finished with all his documentation about the expenditures. Given LVJ's testimony that he used the money for JV's care, the probate court did not clearly err by finding that LVJ did not abuse his authority under the POA.[14]

---

[13] Even so, we note that Waswick asks for the monies from this CD to be given to AW's heirs and to the other person, besides AW and JV, named on the CD (the other person named, according to Waswick, is LVJ's father, Lawrence D. Verga, Sr.). But Waswick never alleges that this CD was "wrongfully cashed" by LVJ, as he does with the "41466" CD. And Waswick's attachments reflect that in 2006, this CD listed AW and "Larry Verga" as beneficiaries of a revocable trust. In 2010, this account named JV and LVJ as trustees. Consequently, Waswick has not established any entitlement to relief with regard to this CD.

[14] Waswick asserts that the probate court's ruling failed to encompass the issue of the checks, but the court stated that LVJ did not breach any fiduciary duty in using the POA. And, although

-10-

Waswick implies that the accounting LVJ prepared was inadequate to capture the true value of the contents of JV's home. LVJ listed the value of the contents as $1,200 based on an initial appraisal by an estate-sale company, although the estate sale netted $226. Again, Waswick does not set forth the purported evidence or testimony establishing that LVJ acted improperly or offer any alternative value for the home contents. We will not reformulate Waswick's arguments for him. *Wilson*, 457 Mich at 243. In any event, we note that LVJ testified about holding a sale for the home's contents and testified that many items went unsold and were donated. Waswick was implying at trial that more money could have been obtained, but LVJ's testimony was adequate to establish that nothing improper occurred regarding LVJ's handling of the matter. The probate court did not err by implicitly ruling that no adjustment in the accounting needed to be made based on the contents of the home.[15]

D. TESTIMONY OF DEPUTY THOMAS ANDERSON AND RELATED ISSUES

Waswick asserts that the court interfered with an ongoing criminal investigation and, at the hearing on April 8, 2019, improperly denied testimony from Deputy Thomas Anderson of the Midland County Sheriff's Department. Waswick contends that Deputy Anderson's testimony was critical to discovering what happened to JV's aluminum fishing boat.

In the midst of trial, Waswick requested a stay pending an alleged criminal investigation into LVJ's handling of JV's estate. Waswick claimed that in June 2018, he spoke with Deputy Anderson and informed him that "certain assets . . . were . . . missing . . . in this matter." Waswick claimed that he was informed that the Michigan Attorney General was looking into the matter. The court stated that, even accepting Waswick's allegation that a criminal investigation was occurring, there was no current criminal case. Therefore, the probate court denied Waswick's request for a stay. Waswick does not argue on appeal that the court erred by denying the motion for a stay. And, no "interference" in this alleged criminal investigation is apparent from the record before us. As such, the authorities responsible for any criminal investigation were entirely free to continue pursuing any credible allegations of fraud or theft.

Waswick asserts that Deputy Anderson's testimony "revealed evidence of a boat that was sold for $400 by . . . [LVJ]." But the court explicitly stated that this value needed to be included in the estate. Accordingly, Deputy Anderson's testimony, that Waswick deems crucial, was incorporated into the court's ruling.[16]

---

Waswick claimed that JV had told him that LVJ been stealing money from him, we must defer to the probate court as the arbiter of credibility. *In re Estate of Erickson*, 202 Mich App at 331.

[15] The court, however, ruled that the value of a pistol needed to be included as part of the estate.

[16] Waswick argues that the probate court "blatantly refused to hear any testimony from Deputy Anderson." This is simply untrue. Deputy Anderson testified quite extensively. Waswick asserts, without any citation to the record, that the probate court initially disallowed Deputy Anderson's testimony because of an error in a witness list. He then states that "[a] separate record was given and Deputy Anderson was allowed to testify, but the [j]udge with her assistant prosecutor's

Waswick, in connection with arguing about Deputy Anderson's testimony, asserts that some testimony was improperly precluded when it should have been admitted as a business record under MRE 803(6). Waswick does not identify what this testimony was or how it impacted the case. In *Wilson*, 457 Mich at 243, our Supreme Court stated:

> Before this Court, the plaintiffs present a one-sentence argument with no citation to authority. On its face it is unclear what issue, if any, that sentence attempts to raise. More importantly, a mere statement without authority is insufficient to bring an issue before this Court. *It is not sufficient for a party simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments*, and then search for authority either to sustain or reject his position. Accordingly, we need not address this issue, and therefore, decline to do so. [(quotation marks omitted; emphasis added).]

Waswick does not even indicate where in the record he attempted to admit the police report. Our review reveals none. Instead, during the deputy's testimony, Waswick asked if the deputy would like to use the report to refresh his memory, and, thereafter, the heirs' attorney commented that Waswick was "only using [the police report] to refresh [the deputy's] memory." In any event, we are not convinced that police report, which was prepared in anticipation of litigation and contained otherwise inadmissible hearsay, would meet the requirements for admission as a business record. See e.g., *Solomon v Shuell*, 435 Mich 104, 127-128; 475 NW2d 669 (1990). Recognizing that it is possible that Waswick refers to the attempt by the heirs' attorney to introduce Michigan Secretary of State records regarding the boat, we again note that the probate court determined that LVJ had improperly omitted the boat from the estate inventory and ordered a correction as a result.[17] Thus, we find no merit in Waswick's argument.

---

background presented the case more as a criminal rather than civil case." The transcript does refer to Deputy Anderson's testimony as a "separate record," but the transcript and Waswick's assertions on appeal do not provide any indication regarding the significance of this "separate record" designation. Moreover, our review of the transcripts reveals that the court employed the applicable court rules to these proceedings and encouraged the parties to comply with them. Significantly, Waswick never asserts that the probate court failed to consider Deputy Anderson's testimony when making its ruling. An "appellant bears the burden of furnishing the reviewing court with a record that verifies the basis of any argument on which reversal or other claim for appellate relief is predicated." *Petraszewsky v Keeth*, 201 Mich App 535, 540; 506 NW2d 890 (1993). Thus, Waswick has established no error with regard to the "separate record" designation.

[17] In his reply brief, Waswick cites the October 6, 2017 hearing, of which the probate court took judicial notice, and implies that LVJ lied about the boat. LVJ stated at the October 2017 hearing that JV had a boat and indicated that he did not know what happened to it. At trial, he testified that JV had promised to give the boat to LVJ's father, but, because LVJ's father did not want it, LVJ sold it for $400. LVJ explained that when he said at the October 2017 hearing that he did not

## E. DISQUALIFICATION

Waswick labels one of his issues as involving a motion for disqualification of the trial judge. Waswick mentions in the body of his primary appellate brief that the probate court denied a motion for disqualification, but he makes no argument regarding this denial.[18] Waswick's briefing of the disqualification issue is deficient and provides us with no basis for reversal. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (quotation marks, ellipsis, and alterations omitted) ("When an appellant fails to dispute the basis of the trial court's ruling, this Court need not even consider granting plaintiffs the relief they seek."); *Wilson*, 457 Mich at 243. Moreover, Waswick failed to preserve this issue for review by requesting a referral to the chief judge under MCR 2.003(D)(3)(a)(i). See *Welch v Dist Ct*, 215 Mich App 253, 258; 545 NW2d 15 (1996). Finally, our review of the record reveals no basis for disqualification under MCR 2.003(C). *In re MKK*, 286 Mich App 546, 566; 781 NW2d 132 (2009).

Affirmed.

/s/ Anica Letica
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien

---

know what had happened to the boat, he meant that he did not know who had purchased it and that the buyer was simply a stranger who had seen it and approached him about buying it.

[18] Waswick's presented "issue 10," in which he implies that the probate court allowed consideration of only the deed at trial, is not mentioned in the body of his briefs. In any event, Waswick's argument is premised on a faulty assertion as the proceedings and the probate court's rulings clearly reflect that more than just the deed was at issue.